# Illinois Official Reports

## Appellate Court

---

*Kelly v. Orrico*, 2014 IL App (2d) 130002

---

| | |
|---|---|
| Appellate Court Caption | BRIAN KELLY and NICOLE KELLY, Plaintiffs-Appellees, v. LARRY ORRICO and RENAE YOCKEY, Defendants-Appellants. |
| District & No. | Second District<br>Docket No. 2-13-0002 |
| Filed | March 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment entered for plaintiffs based on the trial court's conclusion that defendants anticipatorily repudiated their contract to purchase plaintiffs' house was reversed, since the doctrine of anticipatory repudiation did not apply where defendants' announcement that they would not close the deal occurred only after plaintiffs informed them that they had another buyer for the house, and the announcement was no more than an ambiguous implication as to whether defendants would close the contract, and, under those circumstances, the finding of anticipatory repudiation was against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 09-L-1603; the Hon. Kenneth L. Popejoy, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal

Robert G. Black, of Law Offices of Robert G. Black, and Scott M. Day, of Day & Robert, P.C., both of Naperville, for appellants.

Thomas A. Christensen and Brian K. LaFratta, both of Huck Bouma, P.C., of Wheaton, for appellees.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices McLaren and Spence concurred in the judgment and opinion.

## OPINION

¶ 1     Following a bench trial, the trial court entered a judgment in favor of plaintiffs, Brian Kelly and Nicole Kelly, and against defendants, Larry Orrico and Renae Yockey, after concluding that defendants had anticipatorily repudiated their contract with plaintiffs. The parties had entered into a contract for defendants to purchase plaintiffs' home, and plaintiffs filed suit when defendants failed to close on the purchase by August 20, 2008. Defendants now appeal, contending that (1) the trial court's judgment did not match plaintiffs' pleadings, which alleged a breach-of-contract theory of relief; (2) the record failed to support a finding of defendants' anticipatory breach; (3) plaintiffs' election of remedies under a separate contract that they had with a third party to purchase their home precluded a judgment against defendants; and (4) plaintiffs did not suffer damages. For the reasons set forth below, we reverse the trial court's judgment.

¶ 2                                    I. Background

¶ 3     The record reflects that plaintiffs owned a house on East Bryn Mawr Avenue in Itasca. Defendants lived two doors from plaintiffs, and the parties were friends. On July 12, 2007, the parties entered into a contract for defendants to purchase plaintiffs' house for $1.2 million, with the closing date set for May 2, 2008. The parties also agreed that Nicole Kelly, a licensed realtor, would list defendants' house for sale.

¶ 4     On May 2, 2008, the parties agreed that the closing date would be rescheduled to August 20, 2008. The parties also agreed that plaintiffs would list their house for sale.

¶ 5     On June 19, 2008, plaintiffs entered into a contract with Michael and Cindy DiSilvestro for the DiSilvestros to purchase plaintiffs' home for $1.2 million. Brian Kelly telephoned Yockey to advise her of the DiSilvestros' offer, and defendants did not object. Plaintiffs and the DiSilvestros set their closing date for October 8, 2008.

¶ 6     On July 25, 2008, plaintiffs' attorney sent defendants a correspondence advising that plaintiffs would consider defendants in breach of the July 12, 2007, contract unless defendants performed their contractual obligations. On August 21, 2008, plaintiffs' attorney sent defendants a letter notifying them of their breach.

¶ 7    Thereafter, the DiSilvestros defaulted on their contract with plaintiffs. As a result, the DiSilvestros forfeited $50,000 in earnest money to plaintiffs. On May 4, 2009, plaintiffs entered into a contract to sell their home to Brian Gerber, who purchased plaintiffs' home for $1 million.

¶ 8    On December 23, 2009, plaintiffs filed against defendants their single-count complaint alleging breach of contract. Plaintiffs alleged that they had performed their contractual obligations, defendants "failed to perform their obligations as [they] failed to close on the purchase of [plaintiffs' house] on the agreed upon extended closing date of August 20, 2008," and defendants' breach proximately caused plaintiffs damages. Defendants raised various affirmative defenses, including waiver, equitable estoppel, release, lack of consideration, and *laches*.

¶ 9    A bench trial commenced on October 9, 2012. Brian Kelly testified first on plaintiffs' behalf. Brian testified that in May 2008 he had a conversation with defendants regarding their contract. Brian testified that defendants advised him that they were not going to be able to purchase plaintiffs' house, because defendants had been unable to sell their home. Brian told defendants that their contract was not contingent on defendants being able to sell their home or being able to obtain financing. Brian testified that "there was no conversation whatsoever" about defendants being released from their contractual obligations. Brian continued:

> "I basically told them, well, if you guys do not have an intention of purchasing the house, that I would go ahead and put the home for sale. If I had interest or a potential buyer, than [*sic*] I would contact them again, and we could just take it from there."

Brian testified that defendants agreed that plaintiffs could list their house, but that there was no discussion that plaintiffs placing their house on the market would release defendants from the contract. Brian testified that, "if something else comes about," the parties could then "figure out what the best remedy to the situation is."

¶ 10    Brian testified that the DiSilvestros offered to purchase plaintiffs' house for $1.2 million. Brian testified that he called Yockey in June 2008 to inform her of the DiSilvestros' offer and to discuss "where we were with everything." Brian testified that he explained to Yockey that the contract with the DiSilvestros was for the same sale price, but that, because there was a realtor involved in that contract, plaintiffs would incur a $30,000 commission fee. Brian testified that he believed that defendants should be responsible for that fee. Brian testified that, while Yockey did not make any statements indicating a belief that defendants were released from their contract, she "actually seemed excited[;] *** I think there was a feeling of relief because there was another contract at that point." Brian testified that Yockey called him back the next day and told him that she did not believe that defendants were responsible for the $30,000 fee. Describing the conclusion of that conversation, Brian testified:

> "I just wanted to be done with it, also. And I thought that was a very good conclusion to the problem at hand. That, you know, I made a good effort to try to keep the problem taken care of with the least amount of headache or, you know, discomfort for the buyer or the seller. ***
>
> *** [B]ut she didn't feel obligated to pay the commission. And I just said okay, and that was that."

Brian testified that his attorney sent a letter to defendants' attorney on July 25, 2008, and that plaintiffs did not receive a response. Brian testified that his attorney sent defendants another

letter on August 21, 2008, advising defendants that they were in breach of their contract. Plaintiffs did not receive a response from defendants.

¶ 11    On cross-examination, Brian acknowledged that plaintiffs signed the contract with the DiSilvestros after his June 2008 phone conversation with Yockey. Brian explained:

> "We made a decision that *** if you have someone who's going to possibly purchase [the house], to try to pursue it. I did talk with [Yockey] first and explain the situation."

Brian acknowledged that he did not receive anything in writing from defendants advising him that defendants would not close on the contract. Brian testified that "it was a verbal from them with my wife present and myself present." Brian admitted that plaintiffs kept the $50,000 in earnest money from the DiSilvestros after the Disilvestros defaulted on their contract.

¶ 12    Nicole Kelly testified next on plaintiffs' behalf. Nicole testified that she was present during the May 2008 conversation with defendants. Nicole testified that Yockey advised that defendants would not be able to purchase their home. Nicole testified that she was a licensed real estate agent and that she listed defendants' home after the parties had entered into their contract. Nicole testified that she stopped listing defendants' house in June 2008. Nicole explained that she did not stop listing defendants' house after their May 2008 conversation with defendants because:

> "[W]hen [defendants] *** stated that they were not going to be able to purchase our home, we said 'well, we'll try to get another buyer. And that way, that will relieve you your obligation if we can get another buyer for the same price.'
>
> And–but in the meantime, if their house sold, they would be interested at that point in purchasing our home."

Nicole testified that she was present for only the May 2008 conversation with defendants and that there was no discussion of defendants being unconditionally released from their contractual obligations. Nicole testified that it was "clear" that defendants would not be able to close on the sale of plaintiffs' home. On cross-examination, Nicole admitted that she stopped listing defendants' home after defendants had refused to pay the commission fee resulting from the DiSilvestro contract, although she could not remember the exact date. Plaintiffs rested after Nicole's testimony, and the trial court denied defendants' motion for a directed finding.

¶ 13    Yockey testified first on defendants' behalf. Yockey testified that, during the May 2008 meeting, plaintiffs had said that they were considering putting their house on the market to "improve people looking at our house," which could possibly lead to a purchaser for defendants' house and defendants could then purchase plaintiffs' house. Yockey testified that defendants "absolutely never said" that they did not intend to purchase plaintiffs' home and that they were "excited" that plaintiffs had extended the closing date until August 20, 2008, because it gave defendants more opportunity to sell their house. Yockey testified that defendants were working with a lender to obtain a bridge loan, which would have allowed them to purchase plaintiffs' house even if they did not sell their house by August 20, 2008. Yockey testified that defendants did not continue to pursue that loan after Brian called her on June 19, 2008, advising that plaintiffs had another buyer. Yockey testified that Brian asked her if plaintiffs should go ahead with the sale. After speaking with Orrico, Yockey called Brian and told him that, because defendants had not received any offers on their house, plaintiffs should go forward with selling their house to the third party. Yockey testified that, once Brian told her that he had another purchaser, she was "under the impression that we were done." Yockey

testified that, within a week of that conversation, a "for sale" sign that Nicole had placed in defendants' front yard had been removed, which also gave her the impression that they were no longer under contract to purchase plaintiffs' house. Yockey testified that she could see that a "sold" sign had been placed over a for-sale sign in plaintiffs' yard. Yockey testified that, when she received correspondence from plaintiffs' attorney on July 25, 2008, and August 21, 2008, she believed that plaintiffs' house was under contract with a third party. During cross-examination, Yockey acknowledged that defendants' contract to purchase plaintiffs' house did not contain either a sale-of-home contingency or a financing contingency. Yockey clarified that her last conversation with plaintiffs occurred when she gave Brian permission for plaintiffs to sell their house to a third party.

¶ 14 Orrico testified next on defendants' behalf. Orrico testified that, during the May 2008 meeting, plaintiffs suggested that they would put their home up for sale as a way to entice potential buyers to buy defendants' home. Orrico testified that defendants agreed to let plaintiffs list their home. Orrico testified that he never told plaintiffs that he and Yockey would not close on the sale of plaintiffs' home, and he believed that the contract was still in full force and effect. Orrico testified that he was not part of the June 2008 phone call between Brian and Yockey, but that Yockey informed him that plaintiffs had another buyer for their home and that Brian had mentioned that defendants should pay plaintiffs' commission fee on that sale. Orrico testified that defendants decided to let plaintiffs sell their home, because plaintiffs had another buyer. Orrico testified that, shortly after they learned that plaintiffs had another buyer for their home, the for-sale sign in front of defendants' home was removed.

¶ 15 During cross-examination, Orrico acknowledged that he was not part of the discussion where Brian informed Yockey that plaintiffs had another buyer for their home. Orrico testified that he believed that plaintiffs had released defendants from their contract when plaintiffs had entered into the contract with the DiSilvestros. Orrico admitted that he never saw any documentation stating that the contract had been cancelled. Orrico further admitted that he never had any conversations with plaintiffs about defendants being released from the contract, but testified that he came to that conclusion after plaintiffs entered into their contract with the DiSilvestros. Orrico testified that he told his attorney that plaintiffs had entered into another contract to sell their home, but that he never advised the attorney that defendants' contract with plaintiffs had been canceled. Defendants rested after Orrico's testimony.

¶ 16 On December 6, 2012, the trial court entered judgment in plaintiffs' favor. The trial court found that defendants had "clearly created an anticipatory breach of the contract by advising the plaintiffs that they couldn't perform on the rescheduled contingency fee contract." The trial court further found that there was no release or accord and settlement of the parties' contractual rights or obligations. The trial court found that plaintiffs did not have to "go through the useless act [of] tendering performance on the contractual closing date and incur unnecessary damages in light of [defendants'] clear *** anticipatory breach and both parties failing to renegotiate, alter or modify the original contract." The trial court concluded that plaintiffs' "first contract of mitigation" with the DiSilvestros did not constitute plaintiffs terminating or abandoning their contract with defendants, which would occur only when plaintiffs closed on the DiSilvestros' contract and transferred title to their home. The trial court noted that defendants never demanded that plaintiffs perform under the contract, and the trial court rejected defendants' affirmative defenses. The trial court awarded plaintiffs $150,000 in damages. Defendants timely appealed.

II. Discussion

¶ 18                              A. Pleadings

¶ 19        Defendants' first contention on appeal is that the trial court's judgment did not match the pleadings. Specifically, defendants argue that plaintiffs' single-count complaint alleged only a breach-of-contract theory of relief and that plaintiffs never amended their complaint to include an anticipatory-repudiation theory of relief. Nonetheless, defendants note, the trial court "unquestionably relied solely on one theory: anticipatory breach." Plaintiffs counter that they "made clear at all stages of trial" that their claim was based on defendants announcing that they were unable to perform under the contract; further, defendants did not object to the trial court's finding of an anticipatory breach, either before the trial court entered its judgment or in a posttrial motion.

¶ 20        This court addressed a similar issue in *In re J.B.*, 312 Ill. App. 3d 1140 (2000). There, the State filed a petition alleging that the respondents had created an injurious environment for minors by leaving the minors alone for 30 minutes and that one of the respondents, A.B., had a history of leaving the minors unsupervised. *Id.* at 1141-42. After the close of testimony, the trial court adjudicated the minors neglected pursuant to section 2-3(1)(d) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3(1)(d) (West 1998)), which provides that a minor is neglected when he or she is under 14 years of age and left unsupervised for an unreasonable period of time. *In re J.B.*, 312 Ill. App. 3d at 1142. The trial court acknowledged that the State's petition alleged neglect under a different provision of the Act, pertaining to an injurious environment, but it chose to find neglect under section 2-3(1)(d), which was consistent with the testimony. *Id.* Following a subsequent dispositional hearing, the trial court found that the minors' best interests were met by making them wards of the State. *Id.* at 1141.

¶ 21        On appeal, this court noted that a petition for adjudication of wardship is civil and that "it is well settled that a party may not succeed on a theory that is not contained in the party's complaint." *Id.* at 1143. We opined that a party could win a case only according to what the party had presented in the pleadings and that "[a]ny proof *** that is not supported by proper pleadings is as defective as pleading a claim that is not supported by proof." *Id.*

¶ 22        Applying those principles, this court reversed the trial court's judgment. We noted that the State's petition "[c]learly" alleged that the minors were neglected due to an injurious environment and did not claim that the minors were neglected due to the respondents' failure to provide adequate supervision. *Id.* at 1143-44. We noted that the State cited only one of the factors listed under sections 2-3(1)(d)(1) through (1)(d)(15) of the Act, which pertain to neglect by inadequate supervision. Further, on that factor, the petition alleged only that the minors were left alone for 30 minutes, which was insufficient to conclude that the State was alleging that the minors were neglected due to being unsupervised. See *id.* at 1144. We also noted that the Act permitted a petition to be amended to conform to the evidence at any time prior to a trial court's ruling. *Id.* (citing 705 ILCS 405/2-13(5) (West 1998)). Thus, we concluded:

        "Obviously, based on the trial court's ruling on the objection and the way the State presented its case, the State was aware that the evidence suggested that neglect may lie under the failure to supervise provision of the [Act]. Nevertheless, at no time prior to the court's ruling did the State seek to amend the petition to allege that the basis for neglect should be that the minors were left unsupervised. Because the State never

amended the petition, never informed respondents that it was proceeding under inadequate supervision allegations, and argued its case under inadequate supervision, the trial court's judgment must be reversed." *Id.* at 1144-45.

¶ 23      The reasoning in *J.B.* directly applies to this case. Here, plaintiffs' complaint alleged only a breach-of-contract theory of relief. To win on this theory, plaintiffs had to establish the existence of a valid contract, plaintiffs' performance, defendants' breach, and damages. See *Lake County Grading Co. v. Village of Antioch*, 2013 IL App (2d) 120474, ¶ 21. Conversely, anticipatory repudiation of a contract involves a distinct theory of relief. As we discuss in more detail below, anticipatory repudiation is premised on a party's clear manifestation of its intent not to perform under the contract. *In re Marriage of Olsen*, 124 Ill. 2d 19, 24 (1988). Because plaintiffs' pleadings failed to allege that defendants had anticipatorily repudiated the contract by exhibiting a clear manifestation not to perform, any proof submitted to support an anticipatory repudiation was defective, and plaintiffs cannot succeed on such proof. See *In re J.B.*, 312 Ill. App. 3d at 1143.

¶ 24      Further, we reject plaintiffs' argument that defendants forfeited any objection to the deficient pleadings when they did not object either at trial or in a posttrial motion. Plaintiffs have failed to provide us with any authority to support their proposition. More important, section 2-616(c) of the Code of Civil Procedure (Code) (735 ILCS 5/2-616(c) (West 2010)) provides that a "pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." If, as plaintiffs claim, there was "no question whatsoever" that they were proceeding under both breach-of-contract and anticipatory-repudiation theories of relief, plaintiffs could have sought leave to amend the pleadings to conform to the proofs. Nevertheless, at no time, either during trial or after the trial court entered its judgment, did plaintiffs seek to do so. See *In re J.B.*, 312 Ill. App. 3d at 1145. Accordingly, the trial court's judgment must be reversed. *Id.*

¶ 25                                       B. Sufficiency of Evidence

¶ 26      We also agree with defendants that the evidence presented at trial did not demonstrate that they had clearly and unequivocally repudiated their contract with plaintiffs. Defendants argue that their failure to close on the sale by August 20, 2008, resulted from a "change in their position reasonably taken *** based upon [plaintiffs'] own actions," which included plaintiffs listing their home for sale, plaintiffs entering into a contract with the DiSilvestros, plaintiffs placing a for-sale sign in their front yard, and Nicole abandoning her efforts to sell defendants' home once plaintiffs entered into the DiSilvestro contract.

¶ 27      Our supreme court has summarized the doctrine of anticipatory repudiation of a contract as follows:

> "The doctrine of anticipatory repudiation requires a clear manifestation of an intent not to perform the contract on the date of performance. The failure of the breaching party must be a total one which defeats or renders unattainable the object of the contract. [Citation.] That intention must be a definite and unequivocal manifestation that he will not render the promised performance when the time fixed for it in the contract arrives. [Citation.] Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation." *Olsen*, 124 Ill. 2d at 24.

As the supreme court in *Olsen* noted, these requirements exist because "[a]nticipatory breach is not a remedy to be taken lightly." *Id.* at 25. When one party repudiates a contract, the nonrepudiating party is excused from performing or may continue to perform and seek damages for the breach. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1032 (2007). Whether a repudiation has occurred is determined on a case-by-case basis, and a trial court's judgment will not be disturbed unless it is against the manifest weight of the evidence. *Timmerman v. Grain Exchange, LLC*, 394 Ill. App. 3d 189, 201 (2009). A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35.

¶ 28    In *Truman L. Flatt & Sons Co. v. Schupf*, 271 Ill. App. 3d 983 (1995), the reviewing court addressed whether a party had anticipatorily repudiated a real estate contract. In *Schupf*, the parties entered into a contract in which the defendants agreed to sell to the plaintiff a parcel of land for $160,000, contingent upon the plaintiff obtaining a rezoning permit. *Id.* at 984. The contract set the closing for June 30, 1993. *Id.* On May 21, 1993, the plaintiff's attorney sent the defendants a letter advising that the plaintiff had encountered substantial public opposition at a public hearing concerning its rezoning request. *Id.* The letter advised that the plaintiff was still interested in purchasing the property, but requested that the purchase price be reduced to $142,500. *Id.* The defendants rejected that offer, and the plaintiff's attorney sent a follow-up letter dated June 9, 1993, advising that the plaintiff would still proceed with the contract and asking that the defendants contact the plaintiff to arrange a closing date. *Id.* at 985. After additional follow-up correspondence, the defendants' attorney sent the plaintiff a letter on July 8, 1993, advising that the defendants' position was that the plaintiff's failure to waive the rezoning requirement combined with its offer to purchase the property at a lower price voided the contract. *Id.*

¶ 29    Thereafter, the plaintiff filed a complaint against the defendants for specific performance and other relief. *Id.* The defendants responded by filing a motion for summary judgment, which the trial court granted, on the basis that the plaintiff had repudiated the contract. *Id.* at 985-86.

¶ 30    On appeal, the court in *Schupf* reversed the trial court's grant of summary judgment. Noting that the parties did not dispute the facts, the court concluded that the plaintiff's May 21 letter did not constitute "a clearly implied threat of nonperformance." *Id.* at 987. The court concluded that, while the May 21 letter could be read to imply that the plaintiff would not perform under the contract unless the sale price were modified, "such an inference [was] weak," given the totality of the language in the letter. *Id.* The court further concluded that, "[m]ore important," Illinois law required a repudiation to be manifested clearly and unambiguously, and the plaintiff's May 21 letter "at most created an *ambiguous implication* whether performance would occur." (Emphasis in original.) *Id.* The reviewing court further found that, assuming the plaintiff's May 21 letter constituted an anticipatory repudiation, the plaintiff later retracted that repudiation by informing the defendants that it wished to proceed with the purchase. *Id.* at 987-91.

¶ 31    In this case, the reasoning in *Schupf* is instructive and we conclude that defendants' actions, at best, created an ambiguous implication as to whether they would perform under the contract. Initially, we note that the parties stipulated that they agreed to extend the closing date to August 20, 2008. Thus, we must determine whether defendants exhibited a clear and

unambiguous repudiation of the contract in that they would not close on the sale on August 20, 2008.

¶ 32 At trial, Brian testified that he called Yockey in June 2008 to explain to her that plaintiffs had received an offer on their house from the DiSilvestros for the same price and that he believed that defendants should be responsible for the $30,000 commission fee that plaintiffs would incur from the DiSilvestro contract. Brian testified that Yockey called him the next day and told him that she did not believe that defendants were responsible for the fee. That conversation concluded with Brian responding "okay" to Yockey, and he testified that "that was that." We do not believe that defendants' refusal to pay the fee that resulted from plaintiffs' contract with the DiSilvestros reflected a clear and unambiguous repudiation by defendants, demonstrating that they would not close on plaintiffs' home on August 20, 2008. See *Olsen*, 124 Ill. 2d at 25 (holding that a party's statements that he would perform under the contract only when he retired, which was how he interpreted the contract, did not "reveal a clear manifestation of an intention to defeat or breach the contract").

¶ 33 Likewise, we do not believe that Yockey advising Brian that plaintiffs should proceed with their contract with the DiSilvestros, or defendants failing to respond to plaintiffs' July 25, 2008, letter, constituted an anticipatory repudiation of the contract. Pursuant to principles of waiver and estoppel, "a party to a contract may not lull another party into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Vandevier v. Mulay Plastics, Inc.*, 135 Ill. App. 3d 787, 792 (1985).

¶ 34 Here, even if we were to conclude that Yockey's statement to Brian that plaintiffs should proceed with the DiSilvestro contract, or defendants' failure to respond to plaintiffs' July 25, 2008, letter, constituted a clear and unambiguous repudiation of the contract, those actions occurred only after plaintiffs had advised defendants that plaintiffs had another buyer. In our opinion, plaintiffs advising defendants of the DiSilvestro contract and entering into that contract shortly thereafter, combined with Nicole ceasing to list defendants' home for sale after defendants had refused to pay plaintiffs' commission fee, amounted to a forfeiture of plaintiffs' claim against defendants. See *id.* (holding that the plaintiff, who cashed commission checks and continued to solicit business on behalf of a company he thought was breaching its agreement with him over a seven-year period, forfeited his breach-of-contract claim against the company).

¶ 35 In sum, the evidence indicates that defendants' actions amounted to no more than an ambiguous implication as to whether performance would occur; further, those actions occurred only after plaintiffs advised them that they had another buyer in the DiSilvestros. Therefore, the doctrine of anticipatory repudiation, as articulated by our supreme court in *Olsen* (see *Olsen*, 124 Ill. 2d at 25), does not apply to this case and we conclude that the trial court's finding is against the manifest weight of the evidence. Our determination is also consistent with our supreme court's directive in *Olsen* that an anticipatory repudiation of a contract is not a remedy "to be taken lightly." *Id.*

¶ 36                                    C. Remaining Issues

¶ 37 We conclude that the trial court's judgment must be reversed because plaintiffs' pleadings did not match the proofs and because the trial court's finding of anticipatory repudiation is against the manifest weight of the evidence. Accordingly, resolving defendants' remaining issues cannot affect the outcome of this case. Therefore, we will refrain from addressing those

issues. See *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 428 (2000) (holding that if the resolution of a certain question of law cannot affect the result as to the parties or the controversy before it, the court should not resolve the question merely to set a precedent or to guide future litigation).

¶ 38                                     III. Conclusion

¶ 39        For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County.

¶ 40        Reversed.